# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

**ROSS ALAN JENNINGS,**

      **Plaintiff,**

**v.**                                       **Case No.: 1:19-cv-00099**

**ANDREW M. SAUL,**
**Commissioner of the**
**Social Security Administration,**

      **Defendant.**


### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 18, 19, 20). The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be

**DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On October 29, 2015, Plaintiff, Ross Alan Jennings ("Claimant"), completed an application for DIB, alleging a disability onset date of April 15, 2005 due to "problems with both knees, obesity, diabetes, neuropathy, sleep apnea, congestive heart failure, peripheral vascular disease, herniated discs in back, depression, panic attacks, migraines, low testosterone, alcoholism, high blood pressure, and high cholesterol." (Tr. at 175-76, 205). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 15). Claimant filed a request for an administrative hearing, which was held on November 6, 2017 before the Honorable Raymond Rodgers, Administrative Law Judge (the "ALJ"). (Tr. at 31-58). By written decision dated February 5, 2018, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-30). The ALJ's decision became the final decision of the Commissioner on December 7, 2018 when the Appeals Council denied Claimant's request for review. (Tr. 1-8).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 7, 8). Thereafter, Claimant filed a Motion for Judgment on the Pleadings and Memorandum in Support, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 18, 19, 20). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 46 years old on his date last insured. He completed two years of

college and previously worked as a mail processing clerk, sorter, and carrier for the United States Postal Service. (Tr. at 53-54, 206).

### III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this

determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying

4

information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ noted as a preliminary matter that Claimant previously applied for DIB benefits, and his application was denied by decision dated December 26, 2007. (Tr. at 15). The ALJ explained that the onset date would thus be December 27, 2007, the date following the prior ALJ's decision, because consideration of the prior period was dismissed pursuant to the doctrine of *res judicata*. (*Id.*). The ALJ next noted as an initial matter that Claimant met the insured status for disability insurance benefits through December 31, 2010. (Tr. at 18, Finding No. 1). At the first step of the sequential

5

evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity from the date following the prior ALJ's decision through his date last insured. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant's bilateral knee osteoarthritis, diabetes mellitus, and obesity were severe impairments. (*Id.*, Finding No. 3). The ALJ also considered Claimant's depression, and other diagnosed conditions, but found the conditions to be non-severe. (Tr. at 18-19). The ALJ further determined that Claimant's alleged neuropathy, sleep apnea, congestive heart failure, herniated discs, migraines, and alcoholism were not medically determinable impairments because there was no record of diagnoses or treatment for such conditions during the relevant period. (Tr. at 20). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 20-21, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except that the claimant cannot operate foot controls. He can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, frequently balance, stoop, and crouch, occasionally kneel, and never crawl. The claimant can have no exposure to hazardous moving machinery or unprotected heights.

 (Tr. at 22-25, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform any of his past relevant work. (Tr. at 25, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity. (Tr. 26-27, Findings 7 through 10). The ALJ considered that (1) Claimant was born in 1964 and was defined as a younger individual on his date last insured; (2) Claimant had at least

a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 26, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a cleaner, store stock clerk, or laundry service attendant. (Tr. at 26-27, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 27, Finding No. 11).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant raises three challenges to the Commissioner's decision. First, Claimant asserts that the ALJ erroneously discounted his disability ratings and awards from the United States Department of Veterans Affairs ("VA"). (ECF No. 19 at 7). Claimant argues that while the ALJ recognized the ruling in *Bird v. Commissioner of Soc. Sec.*, 699 F.3d 337 (4th Cir. 2012), he failed to provide sufficient reasons for not giving the VA findings substantial weight. (*Id.* at 8). Second, Claimant contends that the ALJ improperly concluded that his psychological impairments were non-severe. (*Id.* at 8-10). Finally, in his third challenge, Claimant alleges that the ALJ erred in assessing a less restrictive RFC than the prior ALJ, without explaining the evidence or reasoning that justified the departure. (*Id.* at 11-12).

In response to Claimant's challenges, the Commissioner points out that judicial review of the final decision is very deferential, and Claimant has not proven that he is disabled under the applicable statutes and regulations. (ECF No. 20 at 10-11). The Commissioner asserts that the ALJ articulated specific reasons for assigning

Claimant's VA disability ratings less than substantial weight in compliance with *Bird*. In particular, the ALJ cited Claimant's treatment notes that were inconsistent with a finding of disability, and also highlighted Claimant's "robust activities during the relevant period." (*Id*. at 12). Furthermore, the Commissioner notes that the ALJ properly considered the four broad areas of mental functioning in concluding that Claimant's depression was non-severe, and the ALJ specifically cited the evidence that supported his analysis. (*Id*. at 13-14). Finally, the Commissioner argues that the ALJ was not bound by the findings of the prior ALJ, and the ALJ explained his reasoning that the limitations previously assessed were not supported by the record of the relevant time period under review. (*Id*. at 15-16).

## V.    Relevant Evidence

The undersigned reviewed all evidence of record and summarizes below the evidence that is most relevant to the issues in dispute.

### A. Treatment Records

#### a.  Records within scope of prior ALJ's decision

On August 9, 2005, Claimant was referred to Sarah N. Rodes, PA-C, regarding his history of depression for the last six to eight years, which Claimant stated was triggered by a "bad divorce." (Tr. at 492). Claimant related that he did not find Paxil or Zoloft to be effective, but he was prescribed Wellbutrin for the past six months and he felt a little better. (*Id*.). Claimant's score on the BECK depression inventory indicated mild mood disturbance. (*Id*.). On examination, Claimant was pleasant and cooperative; his mood was euthymic with appropriate affect; he used clear, concise, and goal directed speech; his insight was normal; his judgment was fair; and his cognitive function and memory were intact. (Tr. at 493). P.A. Rodes increased Claimant's dosage

of Wellbutrin and scheduled counseling. (*Id.*). At Claimant's subsequent appointment on August 30, 2005, Claimant advised that the increased dosage of Wellbutrin was working effectively, and he was also not in any pain. (Tr. at 487-88).

On September 8, 2005, Claimant presented to Craig Boblits, LICSW, at the referral of P.A. Rodes. (Tr. at 484). Claimant related that his depression symptoms began approximately six years earlier when he went through a divorce, his grandparents died, and he was caring for his terminally ill father. (*Id.*). Claimant stated that he was employed by the postal service for 19 years. (*Id.*). However, he took time off for depression and a knee injury that he suffered in the parking lot at work, and he was "falsely accused" of filing a fraudulent worker's compensation claim and fired on April 13, 2005. (Tr. at 484-85). Claimant stated that he lived alone and enjoyed working on cars and watching NASCAR races. (Tr. at 485). Claimant told Counselor Boblits that Wellbutrin was moderately effective in treating his depression. (*Id.*). On examination, Claimant had poor energy and dysthymic mood, but he displayed coherent thought processes, appropriate affect, clear speech, cooperative behavior, normal perception, intact memory and abstract thinking, and good insight and judgment. (Tr. at 486). Claimant expressed that he had zero pain on a ten-point pain scale. (Tr. at 486).

Claimant followed up with P.A. Rodes later that month, on September 30, 2005. He was taking Wellbutrin regularly and doing well. (Tr. at 482). He filed for bankruptcy and was waiting on an arbitration hearing regarding his job termination. (*Id.*). Claimant stated that things were "ok" otherwise. (*Id.*). He was trying to stay busy around the house and helping his mother. (*Id.*). Claimant reported that he slept pretty well, his energy level varied, and his mood was "fine." (*Id.*). On examination, Claimant

9

was pleasant and cooperative, initiated conversation and smiled, and maintained a generally euthymic mood, appropriate affect; clear, concise, and goal directed speech; fair insight and judgment; and intact cognitive function and memory. (Tr. at 482). P.A. Rodes advised Claimant to continue taking medication and seeing his counselor. (*Id*.).

On December 7, 2005, Claimant saw Ann M. Lilly, FNP, regarding diabetes mellitus and high cholesterol. (Tr. at 474). Claimant was taking medications for both conditions. He had lost 15 pounds and was feeling well and expressed no other concerns. (*Id*.). Claimant weighed 324.5 pounds at that appointment. (Tr. at 475).

Claimant followed up with P.A. Rodes on the same date. Claimant was taking Wellbutrin regularly and doing "pretty good." (Tr. at 477). He reported that his mood was dependent on whether his job was reinstated, indicating that the arbitration hearing had been continued. (*Id*.). Claimant was still trying to stay busy around the house. (*Id*.). His mental status examination was again normal, and he was advised to continue taking medication and seeing his counselor. (Tr. at 477).

Claimant presented to Counselor Boblits on December 28, 2005. (Tr. at 472). He stated that his mood was different every day, and his energy level was sporadic. (*Id*.). He was still in litigation over his termination. (*Id*.). Claimant complained that his family doctor had planned to testify against him at the arbitration hearing, but Claimant prevented it by not giving his doctor consent to release his medical information. (*Id*.). He further told Counselor Boblits that he was filmed putting a battery in his mother's car during the time of his alleged injury, and this was being used as evidence against him. (*Id*.). Claimant conceded that he did not have any physical limitations currently, and reported that he was participating in a bowling league. (*Id*.). Claimant was alert and oriented, maintained good eye contact, used relevant speech

content that was goal directed, had a euthymic mood with appropriate affect, and was cooperative and actively engaged in the session. (*Id.*).

At his next appointment with Counselor Boblits on February 21, 2006, Claimant stated that his mood was "up and down" since his last session. (Tr. at 470). However, Claimant continued to bowl, watched NASCAR, and planned to enter his vehicle in car shows in the summer. (*Id.*). His mental status examination was normal. (*Id.*). On June 1, 2006, Claimant told Counselor Boblits that he had just learned that he lost his case and would not get his job back. (Tr. at 463). He was told that he had a pattern of misleading doctors about the extent of his injury. (*Id.*). Claimant was applying for jobs at a bakery and a prison, and stated that he was encouraged to seek disability. (*Id.*). His mental status examination was again normal. (Tr. at 464). Claimant saw P.A. Rodes on the same date. He rated his energy level as average, and reported that he was not in any pain.  (Tr. at 465). Claimant also denied having side effects from Wellbutrin. No issues were documented in his mental status examination. (Tr. at 466).

On January 4, 2007, Claimant told Counselor Boblits that he "slept through" Christmas and New Year's, but he took his mother to visit family in Richmond, Virginia for Christmas. (Tr. at 421). Claimant still bowled in one league, but confessed that he was not feeling optimistic about life. (*Id.*). Claimant's mental status examination was normal, other than his mildly depressed mood and affect. (*Id.*).

On February 7, 2007, Claimant told Carol Phillips, LPN, that he was taking his medications and they seemed "to be working better." (Tr. at 419). Claimant took etodolac for left stomach pain and bilateral knee pain. (*Id.*). He rated his pain as five on a ten-point pain scale. (*Id.*). The next day, Claimant told Counselor Boblits that his mood varied. (Tr. at 418). Claimant did not want to attend group therapy, because he

was anxious about interacting with others. (*Id.*). Claimant stated that he was not getting out much or being active at home, and he worried all of the time. (*Id.*). However, he explained that "things [were not] as bad as they were." (*Id.*). Claimant maintained good eye contact, his speech content was relevant and goal directed, and he was cooperative and actively engaged in the session. (*Id.*). He was scheduled to return for counseling in one month. (Tr. at 419)

Claimant followed up with Counselor Boblits on March 7, 2007, stating that he was under extreme stress due to work-related issues, and was easily agitated and did not want to be around crowds. (Tr. at 412). Claimant complained that his lower back was starting to hurt, which he believed to be related to knee problems from working on concrete floors for so long. (*Id.*). His mental status examination was normal, with the exception of his depressed mood. (*Id.*). Claimant claimed that he left the house very little, but admitted that he still participated in a bowling league. (*Id.*). Claimant saw Mosammat K. Nayem, PA-C, on the same date regarding his depression. P.A. Nayem documented that Claimant walked without assistance, had no difficulty with concentration or attention, appeared stable, and displayed a mildly anxious mood. However, he had a full and appropriate affect and good eye contact. He smiled and initiated conversation. P.A. Nayem also noted Claimant's adequate fund of information; clear, concise, linear, goal-directed speech; coherent thought processes; above average intellect; adequate insight and judgment; and intact cognitive function and memory. (Tr. at 414-15). P.A. Nayem renewed Claimant's Wellbutrin and increased Claimant's dosage of Celexa. (Tr. at 415).

On August 6, 2007, Claimant was still walking without difficulty. (Tr. at 405). X-rays of his knees taken on August 31, 2007 showed minimal degenerative changes in

his left knee and moderate degenerative changes in his right knee, with joint space narrowing and osteophyte formation. (Tr. at 866-67). Claimant told Counselor Boblits the following month, on September 6, 2007, that he was beginning to experience back pain when he stood too long, but he was trying to maintain involvement in bowling. (Tr. at 366). Claimant also complained of having panic attacks when he was around people and feeling stressed. (*Id.*). In terms of daily activities, Claimant cared for his dogs and cat. (*Id.*). There were no issues on examination other than Claimant's depressed mood. (*Id.*).

On October 5, 2007, Claimant advised Counselor Boblits that he received his service-connected disability rating of 80 percent, but Counselor Boblits noted that Claimant "minimized its significance." (Tr. at 364). Claimant planned to use the initial payment to make repairs to his home. (*Id.*). Claimant had not been anywhere since his last session and had not had any panic attacks, but Claimant reported no improvement in mood and stated that he had a headache for three days. (*Id.*).

On November 19, 2007, Claimant presented to Firoz Uddin, M.D., for chronic headache, depression, and dizziness due to diabetes. (Tr. at 360). Claimant was completely independent in his activities of daily living, transfer, and ambulation. (Tr. at 361). Dr. Uddin believed that Claimant's migraines were caused by depression, and his dizziness was most likely related to medication, sleep issues, or stress-related difficulties. (Tr. at 361-62).

### b. Records of relevant period

On February 21, 2008, Claimant saw Mary Farmer, MSW, Ph.D., at the VA Medical Center. He stated that he was "still depressed" and sleeping as much as possible, but he hoped to be more active when the weather improved. (Tr. at 795).

Claimant related that his knees bothered him all of the time and he could not do much physical activity, but his new medications gave him more energy and helped him lose weight. (*Id.*). Claimant bowled weekly with his friends and hoped to go to the Bristol NASCAR race. (*Id.*). His mood was dysphoric with congruent affect, but his mental status examination was otherwise normal. (*Id.*).

On April 7, 2008, Claimant advised Ann M. Lilly, FNP, that he had not been watching his diet for six months, and he now weighed 316 pounds. (Tr. at 734, 736). Claimant appeared uncomfortable standing. He had ropey varicosities in his right lower leg, but he did not have any swelling in his ankles and was ambulating unassisted. (Tr. at 736). Nurse Lilly adjusted Claimant's medications for diabetes and advised him to follow a proper diet. (Tr. at 738). Claimant stated that he did not want to go on insulin but instead wanted to lose weight and manage his diabetes through diet and exercise, a plan which Nurse Lilly praised. (Tr. at 734, 738). Nurse Lilly referred Claimant for prosthetic shoes and socks. (Tr. at 737).

On May 26, 2008, Claimant presented to the Emergency Room. He had redness and blisters in the area of a new tattoo. He also had minor swelling in his ankles after standing all day at a car race. (Tr. at 679). Nurse Lilly noted on June 13, 2008 that Claimant looked well, alert, and oriented. He reported having met a new friend and was interested in medication for erectile dysfunction. (Tr. at 671-72). Claimant still had ropey varicosities in his right lower leg, but he did not have any swelling in his ankles. (Tr. at 672). He was wearing a right knee brace, but he was not using a cane. (*Id.*). Claimant's diabetes was much improved on only oral medication and good diet management. (*Id.*).

On January 22, 2009, Claimant advised social worker Anessa Y. Sherrod that he

had been out of medication for one month and was feeling more depressed with increased mood swings and crying spells. (Tr. at 1116). However, Claimant stated that the transition with his new marriage and stepson was going well. (*Id*.). Claimant was attending a weekly depression group, which he enjoyed. (*Id*.). Claimant's mental status examination was normal, and he walked without assistance. (Tr. at 1116, 1125). Claimant saw Russell L. Martin, P.A., on the same date. Claimant complained of knee pain that he rated as eight on a ten-point pain scale. He reported having maintained minimal activities for a while. (Tr. at 1120). However, Claimant also stated that he had fair mood control, sleep, and appetite while on medication. (*Id*.). P.A. Martin likewise noted normal findings on Claimant's mental status examination. (Tr. at 1121). He prescribed medications, increased the frequency of counseling, and advised Claimant to get a hobby. (Tr. at 1121).

On March 9, 2009, Claimant reported to Counselor Boblits that he received a 100 percent VA disability rating, and he had gotten married. (Tr. at 1111). Claimant stated that things were better for him since the wedding, but he was more stressed. (*Id*.). He related that he had good relationship with his stepson and former in-laws and resumed attending church. (*Id*.). Claimant still had severe headaches, but less frequently. (*Id*.). He had problems with his temper and panic attacks, as well as a passing suicidal ideation with no plan to act, but these had decreased since his marriage. (*Id*.). His mental status examination was normal other than his depressed mood. (*Id*.).

On April 17, 2009, Claimant saw Jennifer N. Taylor, PA-C, regarding depression. He reported that his energy level fluctuated. Nonetheless, Claimant had joined a fitness center and planned to start exercising. (Tr. at 1109). There were no

issues in his mental status examination, and Claimant was continued on Wellbutrin and Celexa. (Tr. at 1110).

Claimant told Counselor Boblits on May 18, 2009 that his mood was "up and down," meaning that one day he felt fine and the next day he felt out of it. (Tr. at 1104). Claimant's diabetes was better controlled, and he had been planting flowers and mowing grass. (*Id.*). Claimant also visited his mother two or three times per week, and she was doing well. (*Id.*). Claimant sometimes had panic attacks in crowds and passing suicidal ideations with no plan to act, but his medication continued to be helpful. (Tr. at 1104-05). His mental status examination was normal. (Tr. at 1105). Two days later, Nurse Lilly performed a diabetic examination, and Claimant had normal pedal pulses and sensory examination of his feet. (Tr. at 1100).

On June 18, 2009, Claimant told Counselor Boblits that he felt like his knees were getting worse every day, but he was not willing to undergo knee replacement because it would limit him physically. (Tr. at 1093). He stated that he tended to overdo it when he was feeling well, and then he paid for it. (Tr. at 1094). Claimant's diabetes was well controlled. (*Id.*). His mood was the same as the "past 15 years." (*Id.*). He reported good and bad days and lack of motivation. (*Id.*). Claimant stated that medication helped his panic symptoms. (Tr. at 1094-95). His mental status examination was normal. (*Id.*). Later that month, on June 28, 2009, Claimant presented to the Emergency Room. He had poison ivy after mowing and weed-eating the yard. (Tr. at 1039). He was noted to be ambulatory. (Tr. at 1058).

On July 22, 2009, Claimant told Counselor Boblits that he would experience one day when he felt really good and then several days feeling down. (Tr. at 1032). Claimant reported that someone had burned down his wife's vacant home, which they were

about to start renting. (*Id.*). He was angry because investigators insinuated that he and his wife set the fire. (*Id.*). Claimant complained that he continued to have lots of trouble with his knees and legs and would only consider knee replacement surgery as a last resort. (*Id.*). His mental status examination was again normal. (*Id.*).

On September 1, 2009, Claimant again told Counselor Boblits that the insurance company was giving his wife a hard time relating to the fire on her property. Claimant admitted there was evidence of arson, but denied that his wife was responsible. (Tr. at 1030). Claimant's diabetes was under control. He reported that he had gone to the beach with his family recently, and enjoyed the vacation. (*Id.*). Claimant stated that he liked to fish and watch NASCAR with his stepson. (*Id.*). His mood continued to fluctuate, and he stayed in bed all day once or twice per week. (*Id.*). He also reported that his knees were worsening. (*Id.*). Claimant's mental status examination was normal at this visit, and during his next appointment with Counselor Boblits on October 15, 2009. (Tr. at 1029, 1030). He still ambulated unassisted. (Tr. at 1020).

On November 18, 2009, Claimant advised Counselor Boblits that he was probably going hunting with his father-in-law next weekend, and also had recently gone to the beach for his first wedding anniversary. (Tr. at 1021). His relationships continued to go well. He mentioned that he helped his stepson build a model car, which won a Kiwanis race. (*Id.*). Claimant also planned to have his vintage Mustang painted to enter it in car shows in the Spring. (*Id.*). He reported that his physical issues were "about the same." (*Id.*). His mental status examination was normal. (Tr. at 1022).

Claimant told Counselor Boblits on December 30, 2009 that Christmas "wasn't too bad." (Tr. at 1016). He visited family several times, but he would have preferred to stay home. (*Id.*). He gained 20 pounds on new diabetes medication, but it effectively

controlled his blood sugar. (*Id*.). Claimant reported that he enjoyed hunting with his father-in-law during the week of Thanksgiving and had killed two deer. (*Id*.). He also attended NASCAR races with his wife throughout the year. (*Id*.). Claimant stated that his mood was more depressed, as it typically was during November and December. (*Id*.). Claimant was working on his home, but complained that his knees hurt and his ankles swelled when he was on his feet for a couple of hours. (*Id*.). His mental status examination was again normal. (*Id*.).

On February 4, 2010, Claimant told Counselor Boblits that he had not been able to get out of the house primarily due to weather. (Tr. at 1013). He had stayed home with his stepson a lot due to school closings. (*Id*.). He reported that he continued to have depression symptoms with no significant change, and he suffered knee problems and ankle swelling if he was on his feet for several hours. (*Id*.). Claimant was working on having his mustang restored. (*Id*.). His mental status examination remained normal. (Tr. at 1014).

At his next monthly appointment with Counselor Boblits on March 5, 2010, Claimant reported problems falling asleep, stating that he had phases of insufficient or excessive sleep, sometimes sleeping 12 hours per night. (Tr. at 1011). He again noted that he had been staying home with his stepson, who was off school due to the weather. (*Id*.). Claimant stated that he was buying a jukebox and planning to go on a cruise in August. (*Id*.). His mental status examination was still normal. (Tr. at 1012). On the same day, Claimant saw Gordon S. Kinkaid, M.D. Claimant was morbidly obese at 339 pounds; consequently, he was given the option of bariatric surgery. (Tr. at 1004-05). Nevertheless, Claimant had stable gait and no edema in his lower extremities, joint effusion, or cyanosis. (Tr. at 1005).

On April 8, 2010 Claimant told Counselor Boblits that his continued knee problems were now causing back pain. Claimant stated that he had a lot to do around the house, but was having difficulty getting motivated. (Tr. at 1000). Notwithstanding these issues, Claimant reported that he was going to bowl in a tournament. His mental status examination was documented as normal. (*Id.*).

The following month, on May 7, 2010, Claimant advised Counselor Boblits that things were going better in his life than they had in several years. (Tr. at 997). He claimed to still have depression and complained that his energy level and ambition were worse over the past few months. (*Id.*). He also reported that his stepson had ADHD and was becoming increasingly more violent. (*Id.*). However, Claimant built a car with his stepson, which won the competition and advanced him to the state championship race. (*Id.*). Claimant also did well in a recent bowling tournament and was considering bowling in an upcoming couples league. (*Id.*). Claimant had purchased the jukebox and was buying records for it. (*Id.*). His mental status examination was again normal. (Tr. at 998).

On June 30, 2010, Claimant told Counselor Boblits that he had the same level of depression, yet he spent the past weekend at a hunting camp. (Tr. at 990). He also expressed interest in building a cabin on his father-in-law's property. (*Id.*). He stated that he enjoyed hunting, although it was difficult to take his stepson. He also noted that he had home improvement goals that he hoped to get a loan to complete, but he stated that back problems were starting to impact his activity level. He reported that the pinewood derby car he built for his stepson had won fourth place in the state championship. (Tr. at 990-91). On examination, Claimant had a mildly depressed mood, but otherwise, his mental status examination was normal. (Tr. at 991). He

walked without assistance. (Tr. at 994).

Claimant saw Seema Anand, M.D., on July 30, 2010 to discuss bariatric surgery. (Tr. at 984). Claimant said that his dietary habits were irregular; he ate large portions of food, and his exercise capacity was limited due to knee pain. (*Id.*). Nonetheless, Claimant's diabetes was in the acceptable range. Dr. Anand suggested that Claimant give a fair try at lifestyle modifications for the next three months and then revisit the issue. (*Id.*). He still ambulated unassisted. (Tr. at 987).

On September 9, 2010, Claimant told Counselor Boblits that he was working on building a cabin on his father-in-law's property and recently enjoyed a cruise to the Bahamas. (Tr. at 976). He was considering selling his mustang, because he was too busy around the house and with the cabin. (*Id.*). He complained of depressed mood, sleep issues, restless legs, and leg pain that he stated sometimes kept him awake. (*Id.*). He was wearing bracelets that reduced his ankle swelling. (*Id.*). Claimant had a mildly depressed mood, but an otherwise normal mental status examination. (*Id.*). On the same date, Claimant saw Janet Sipilovic, PA-C, for diabetes follow up. Claimant was doing well overall, had joined a health club and was doing pool activity. He had lost five pounds. (Tr. at 968). On examination, Claimant had bilateral knee incision with crepitus, but stable gait and no joint effusion, edema, or cyanosis. (Tr. at 969). For his bilateral internal knee derangement, he was continued on medications and advised to do swim therapy. (Tr. at 971). His depression and diabetes were stable on medications. (*Id.*).

### c.  Records after date last insured

On January 30, 2014, Claimant presented as a new patient to Michael B. Remines, D.O., complaining of swelling in his legs, back pain, and lack of energy,

stating that he slept all of the time for the last several years. (Tr. at 1280). However, Claimant admitted that he was feeling well and had no headache, myalgia, joint pain, muscle cramps, dizziness, weakness, numbness, anxiety, changes in sleep pattern, or mood changes. (Tr. at 1281). On examination, he had normal posture, gait, muscle strength in all muscles, sensation, and coordination, as well as no psychiatric abnormalities. (Tr. at 1281-82). Years later, on November 16, 2016, Dr. Remines documented that Claimant continued to do well, was going hunting, and was tolerating medications well without side effects. (Tr. at 1312). His chronic illnesses remained stable. (*Id*.).

### B. Prior ALJ's Decision

In a decision dated December 26, 2007, the prior ALJ assessed Claimant's RFC, concluding that Claimant could perform medium work, which allowed him the option to sit or stand every 15 to 30 minutes and did not involve detailed and complex tasks or instructions. Claimant was not to have interaction with supervisors or the public, and he could not tolerate anything more than moderate workplace stress. (Tr. at 66-67).[1]

### C. Evaluations and Opinions

On December 13, 2007, the VA issued a decision finding that Claimant was disabled as of July 26, 2006. (Tr. at 170). The VA assigned the following ratings to Claimant's conditions:

| Percentage of service-connected disability | Effective date | Condition |
|---|---|---|

---

[1] The Transcript of Proceedings includes an incomplete record of the prior ALJ's decision. (Tr. at 59-69). However, Claimant does not identify or pose any challenge related to the incomplete record.

| 50% | July 26, 2006 | Major depressive disorder with secondary alcohol abuse associated with chondromalacia of the right patella |
| 30% | July 6, 2006 | Headaches associated with major depressive disorder with secondary alcohol abuse |
| 20% | July 6, 2006 | Type II diabetes mellitus associated with chondromalacia of the right patella |
| 10% | May 31, 2005 | Chondromalacia of the left patella |
| 10% | August 31, 2007 | Peripheral neuropathy of the right lower extremity associated with Type II diabetes mellitus |

As such, the VA found that Claimant had 90 percent combined service-related disabilities from August 31, 2007. (Tr. at 168-69).

On November 6, 2015, Narendra Parikshak, M.D., found Claimant's physical impairments to be non-severe and stated that there was insufficient evidence to assess Claimant's RFC before his date last insured. (Tr. at 80-82). On November 12, 2015, Jeff Harlow, Ph.D., likewise found that Claimant's affective disorder was non-severe, and assessed that there was not enough evidence to evaluate Claimant's claim of mental impairments before his date last insured. (*Id.*).

On February 11, 2016, James Binder, M.D., assessed, based upon his review of the records, that Claimant could perform medium work with an option to sit or stand every 15 to 30 minutes. (Tr. at 92). In making that finding, Dr. Binder gave the prior ALJ's assessment great weight and stated that the evidence did not warrant any additional limitations. (Tr. at 93).

### D. Claimant's Statements

Claimant testified at his administrative hearing on November 6, 2017 that he stopped working at the post office in 2005, because he was missing a lot of work due to swelling in his knees, back problems, and depression. (Tr. at 37, 39). He was offered a job as a prison guard afterward, but he declined it because he was granted VA disability benefits. (Tr. at 40). Claimant testified that he was also diagnosed with diabetes in 2003, which caused congestive heart failure, worsened his depression, and caused significant weight gain. (Tr. at 40). He claimed that he could not hardly feel his feet or lower legs due to neuropathy. (*Id*.). As far as mental impairments, Claimant indicated that he struggled with depression most of his life. He started receiving treatment in 2005 or 2006 and it helped some, but he still had "spells" of depression when he would stay in bed for four or five days straight. (Tr. at 42, 48). When he worked at the post office, he would have depressive episodes around Christmas and the anniversary of his father's death; they lasted two or three days to two or three weeks. (Tr. at 43). Claimant admitted that he also had periods when he was more functional. He was never hospitalized for depression. (Tr. at 42, 48, 50). He conceded that during the relevant period, he hunted, traveled with his wife to attend NASCAR races, went to the beach, built his stepson a pinewood derby car, worked on his home, mowed the lawn, used a weed eater, and helped care for his special needs stepson, including caring

for him exclusively for periods each day. (Tr. at 44-46, 50-52). He stated that he made himself "do stuff" on most occasions. (Tr. at 45). Claimant testified that he was investigated for a fraudulent worker's compensation claim in 2005 because he alleged knee pain, wore a knee immobilizer, and walked with crutches, but he was captured on video changing a car battery without a knee immobilizer or crutches, and he appeared to be pain free. (Tr. at 46). Claimant stated that he had to change the car battery to help his mother because he was her only caregiver. (*Id.*).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  <u>Discussion</u>

### A. *VA Disability Findings*

In his first challenge to the Commissioner's decision, Claimant argues that the ALJ did not provide sufficient reasons for giving little weight to the VA's ratings and determination that he was disabled. (ECF No. 19 at 7-8). In *Bird,* the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") discussed the role that VA disability ratings should play in the SSA's disability determination process. To begin, the Fourth Circuit confirmed the basic rule that other agency decisions, while not binding on the SSA, "cannot be ignored and must be considered" when evaluating a claimant's eligibility for social security disability benefits. *Bird*, 699 F.3d at 343 (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 n. 1 (4th Cir. 1983) and SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006)).[2] With respect to the VA, the Fourth Circuit acknowledged that it had never explicitly addressed the precise weight the SSA should afford to VA disability ratings. Reviewing the law of other jurisdictions, the Fourth Circuit pointed out that varying degrees of deference had been given to the VA's determinations. The Fourth Circuit reasoned that even though courts differed on the amount of weight to give, "[t]he assignment of at least some weight to a VA disability determination reflects the fact that both the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability." *Id.* The Court added, "[b]oth programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and

---

[2] SSR 06-03p provides, in relevant part, that while disability is an administrative finding reserved to the Commissioner, the SSA must consider disability decisions by other governmental and nongovernmental agencies. As such, evidence of a disability decision by another agency cannot be ignored and must be analyzed when determining Social Security benefits.

continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims." *Id.* (citing *McCartey v. Massanari,* 298 F.3d 1072, 1076 (9th Cir. 2002)). Noting that "the purpose and evaluation methodology of both programs are closely related," the Fourth Circuit concluded that "a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency." *Id.* Consequently, the Fourth Circuit mandated as follows:

> [I]n making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.

*Id.*

In this case, the ALJ discussed the VA findings that Claimant was unemployable as of July 26, 2006 and 90 percent disabled as of August 31, 2007 under the VA's guidelines. (Tr. at 24). The ALJ cited that the VA assigned ratings of 50 percent disability for major depressive disorder with secondary alcohol abuse, 30 percent disability for headaches, 20 percent disability for right chondromalacia patella, 10 percent for left chondromalacia patella, 20 percent for type II diabetes mellitus, and 10 percent for left lower extremity peripheral neuropathy. (*Id.*). The ALJ noted the *Bird* instruction that VA disability determinations are entitled to substantial weight *unless* the record clearly demonstrated that a deviation is appropriate. (*Id.*). Applying this standard, the ALJ found that the VA's disability finding was inconsistent with the evidence of record for the following reasons. (*Id.*).

Regarding depression, the ALJ cited that Claimant's mental status examinations

were largely within normal limits with good hygiene, good eye contact, relevant and goal directed speech, euthymic mood, appropriate affect, and cooperative participation. (*Id*.). The ALJ previously determined at step two of the sequential evaluation that Claimant had no limitations in any of the four areas of mental functioning known as "paragraph B" criteria, noting that despite Claimant's subjective complaints of fluctuating mood and depression, his mental status examinations were normal, other than occasional depressed mood. (Tr. at 19-20). In addition, the ALJ noted that throughout the relevant period, Claimant hunted, bowled, attended NASCAR races with his wife, went on vacation, performed household chores, mowed the lawn, planted flowers, and helped care for his stepson, who had special needs. (Tr. at 20).

As to Claimant's migraines, the ALJ acknowledged Claimant's VA disability ratings for the condition, but concluded that Claimant did not receive treatment for migraines during the relevant period. (Tr. at 20). Likewise, the ALJ noted that there was no record of diagnoses related to alcohol use or neuropathy. (*Id*.). Therefore, the ALJ found that these conditions were not medically determinable impairments under SSA regulations. (*Id*.). Regarding Claimant's knee issues, the ALJ cited Claimant's physical examinations findings that Claimant had some discomfort standing and knee crepitus, but had normal sensation in his feet and no need for an assistive device. (Tr. at 24). Finally, in terms of Claimant's diabetes, the ALJ stated that the condition was well controlled. The ALJ noted that in June 2008, Claimant's blood glucose was much improved; in May 2009, Claimant reported that he was prescribed new medication; and, in March 2010, Claimant's blood glucose was in the acceptable range even though he was not yet controlling his diet. (Tr. at 23). The ALJ further observed that in

September 2010 Claimant was doing well and had joined a health club. (*Id.*).

The ALJ's decision clearly explains, with appropriate citations to the record, the basis for the ALJ's determination that the VA ratings and disability finding were inconsistent with the evidence of record, and the ALJ's analysis is supported by substantial evidence. Claimant's date last insured was December 31, 2010. Claimant got married in May 2008, and he stated in March 2009 that he had a good relationship with his wife, stepson, and in-laws, and things were better for him since the wedding. (Tr. at 1111). In December 2009, Claimant reported that he enjoyed hunting with his father-in-law over Thanksgiving and had killed two deer. He visited family several times over Christmas and it "wasn't too bad." He attended NASCAR races with his wife throughout the year. (Tr. at 1016). He complained of knee pain and ankle swelling if he was "on his feet for a couple of hours," and he reported depression, but he nevertheless worked on his home and cars, and he had a normal mental status examination. (*Id.*). In March 2010, Claimant reported that he had been staying home with his stepson, who was at home due to school closings, and was also buying a jukebox, having his vintage car restored, and planning a summer cruise. (Tr. at 1011). His mental status examinations were normal at all of his visits through September 2010 with the exception of his occasional mildly depressed mood. (Tr. at 976, 991, 998, 1000, 1012). Claimant maintained good hygiene, eye contact, and cooperation; spoke with relevant and goal directed speech; and displayed appropriate affect. (*Id.*).

Claimant continued to complain of knee pain that he said affected his activity level. While he had bilateral knee incision with crepitus, he ambulated without assistance and maintained a normal gait with no joint effusion, edema, or cyanosis through September 2010. (Tr. at 969, 987, 994, 1005). In may 2010, Claimant shared

that he had bowled well in a tournament and was considering joining a couple's league. (Tr. at 997, 1000). In June 2010, he reported that he spent the past weekend hunting and was working on building a cabin on his father-in-law's property. (Tr. at 990). Claimant also built a pinewood derby car for his stepson, which advanced all of the way to the state tournament. (*Id.*). In September 2010, Claimant explained that he recently enjoyed a cruise to the Bahamas and was thinking of selling his mustang because he was too busy around the house and with the cabin. (Tr. at 976). Claimant was doing well overall and had joined a health club. (Tr. at 968). His diabetes and depression were stable on medications. (Tr. at 976).

In fact, Claimant's conditions remained stable even years after his date last insured. In January 2014, Claimant complained of swelling in his legs and back pain, but he stated that he was feeling well with no headache, myalgia, joint pain, muscle cramps, weakness, numbness, anxiety, or mood changes. (Tr. at 1281). He had normal posture and gait, muscle strength, coordination, and sensation, and he had no issues in his mental status examination. (Tr. at 1281-82). Even as late as November 2016, Claimant continued to hunt, was tolerating his medications well without side effects, and his chronic conditions were documented as stable. (Tr. at 1312). Moreover, despite the VA's findings, the record does not reflect any diagnoses or treatment related to headaches, alcohol abuse, or neuropathy during the relevant period.

For all of the above reasons, the undersigned **FINDS** that the ALJ complied with *Bird* by providing sufficient reasons for deviating from the VA's disability ratings, and the ALJ's analysis is supported by substantial evidence. *See, e.g., Roddey v. Saul*, No. 3:18-CV-00174-KDB, 2019 WL 5799332, at *7 (W.D.N.C. Nov. 6, 2019) ("Based on this analysis and the full discussion of Roddey's medical history, limitations and

activities reflected in the remainder of the ALJ's decision, the Court finds that the ALJ complied with *Bird* and the other authority cited by Roddey. Thus, the ALJ's decision should not be reversed or remanded on the ground that the ALJ did not properly consider the VA's disability finding."); *Stracco v. Saul*, No. 118CV1187CMHTCB, 2019 WL 4724319, at *5 (E.D. Va. Aug. 14, 2019), *report and recommendation adopted,* 2019 WL 4720982 (E.D. Va. Sept. 26, 2019) ("[T]he ALJ completely complied with the Fourth Circuit's decision in *Bird* [...] although Plaintiff has a 100% disability rating from the VA, the ALJ appropriately afforded the VA rating little weight. The ALJ provided a detailed discussion of why the subjective and objective evidence in the record did not support the inclusion of any functional limitations not already accounted for in the RFC. The ALJ's decision here is further supported by her earlier comprehensive review of the evidence in the record.") (citations omitted).

### B. Non-Severe Mental Impairment

Next, Claimant argues that the ALJ erred in finding his mental impairments non-severe. At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. § 404.1522(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Of relevance to the instant matter, basic work activities include understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-

workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1522(b).

As previously explained, when a claimant alleges a mental impairment, the ALJ must apply the special technique at step two of the analysis. If the ALJ determines that the claimant has a medically determinable mental impairment, the ALJ rates the degree of functional limitation in four broad categories, known as the "paragraph B" criteria, which include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself. 20 C.F.R. § 404.1520a(c).[3] A rating of "none" or "mild" in the foregoing criteria will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1).

Importantly, the claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least

---

[3] The paragraph B criteria were revised effective January 17, 2017. The new criteria are applied to claims filed on or after the effective date *and to any claims pending on or after the effective date.* Claimant's application was filed in 2015, but it was still pending on January 17, 2017, and the ALJ's decision was not issued until 2018. Therefore, the ALJ correctly applied the new paragraph B criteria to Claimant's application. *Carroll v. Berryhill,* No. 7:17-CV-215-KS, 2019 WL 938879, at *2–3 (E.D.N.C. Feb. 26, 2019); *Kristyn H. v. Berryhill,* No. 7:18-CV-351, 2019 WL 2570531, at *8 (W.D. Va. June 21, 2019); *Maynard v. Berryhill,* No. 2:17-CV-4131, 2018 WL 6036482, at *4 (S.D.W. Va. July 27, 2018), *report and recommendation adopted as modified,* 2018 WL 4659344 (S.D.W. Va. Sept. 28, 2018); *see* https://www.federalregister.gov/documents/2016/09/26/2016-22908/revised-medical-criteria-for-evaluating-mental-disorders.

twelve months and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

In evaluating the evidence at step two, or at subsequent steps of the sequential evaluation, the regulations in effect at the time of Claimant's application for benefits— and, thus, the regulations governing the ALJ's review—suggested "a hierarchy of medical opinions, with opinions by treating physicians generally being afforded the greatest weight, followed by examining sources, and finally, nonexamining sources." *Cook v. Colvin*, No. 2:15-CV-07181, 2016 WL 5661348, at *3 (S.D.W. Va. Sept. 29, 2016) (quoting *Bevans v. Colvin*, No. 3:13–12502, 2014 WL 4925431, at *3 (S.D. W. Va. Sept. 30, 2014)). A treating physician's opinion was to be given controlling weight when the opinion was well supported by medically acceptable clinical and laboratory diagnostic techniques and was not inconsistent with other substantial evidence. *Id.* Regardless of source, an ALJ was required to evaluate every medical opinion in accordance with the following factors: (1) whether the source has examined the claimant and the length and frequency of the examinations; (2) the nature and extent of any treatment relationship; (3) the extent to which the source's opinion was

supported by the medical evidence in the record; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion was rendered by a specialist in his or her area of specialty; and (6) other relevant factors." *Id.*; *see* 20 C.F.R. § 404.1527(c). However, while the ALJ had to consider the relevant factors, the ALJ was not required to explicitly discuss each factor. *See Hardy v. Colvin*, No. 2:13-CV-20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014). In addition, an ALJ's determination as to the weight to be assigned to a medical opinion is generally not disturbed absent some indication that the ALJ dredged up specious inconsistencies or did not give good reason for the weight afforded to a particular opinion. *Id.* (citing *Koonce v. Apfel*, 166 F.3d 1209, 1999 WL 7864, at *2 (4th Cir. 1999)).

Here, the ALJ found that Claimant's depression was a medically determinable impairment. (Tr. at 19). Thus, the ALJ performed the special technique to evaluate whether Claimant's depression caused more than minimal limitation in Claimant's ability to perform basic mental work activities. (*Id.*). As discussed above, the ALJ found that Claimant had no limitations in the functional areas of understanding, remembering, or applying information; interacting with others; maintaining concentration, persistence, or pace; and adapting or managing himself. (*Id.*). The ALJ based this analysis on Claimant's normal mental status examinations and robust activities of daily living. (Tr. at 19-20). Overall, because Claimant's medically determinable mental impairments caused no more than mild limitation in any of the functional areas, the ALJ concluded that they were non-severe. (Tr. at 20).

The ALJ's analysis is very clearly supported by more than a scintilla of evidence in the record. As discussed in the preceding section, despite Claimant's subjective complaints, his mental status examinations were consistently normal, other than

intermittent depressed mood, and he maintained a good relationship with his family, traveled, participated in a bowling league, hunted, and performed chores and activities at home throughout the relevant period. Claimant did not receive any significant treatment for depression and did not suffer any exacerbation of his depression that necessitated specialized treatment or hospitalization.

Overall, Claimant fails to identify any relevant conflicting evidence that the ALJ overlooked concerning Claimant's mental impairments, nor does he show that the ALJ failed to apply the correct law, or that he made any other error that rendered his decision unsupported by substantial evidence. Claimant is simply asking the court to re-weigh the medical evidence and reach different conclusions than the ALJ, which is not the court's role in reviewing the Commissioner's decision. The Court must uphold the Commissioner's decision if it is supported by more than a scintilla of evidence. It is not the province of the Court under 42 U.S.C. § 405(g) to weigh the evidence or perform the special technique to evaluate the severity of a claimant's mental impairments. Where, as in this case, the ALJ considered the evidence, provided logical reasons for his conclusions, applied the correct legal standards, and there is more than a scintilla of evidence to support the ALJ's findings, the Court must affirm the Commissioner's decision. Therefore, the undersigned **FINDS** that the ALJ's step two analysis of Claimant's mental impairments is supported by substantial evidence.

### C. Prior ALJ's Decision

In his final challenge to the Commissioner's decision, Claimant argues that the ALJ did not properly consider the prior ALJ's RFC determination or explain why he assessed a less restrictive RFC than the prior ALJ determined. Acquiescence Ruling 00-1(4) ("AR 00-1(4)") explains how the SSA applies the Fourth Circuit's holdings in *Lively*

*v. Sec'y of Health and Human Servs.*, 820 F.2d 1391 (4th Cir. 1987) and *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473 (4th Cir. 1999).[4] In those decisions, the court of appeals addressed how an ALJ should treat findings in a prior administrative proceeding when determining the legitimacy of a later claim for benefits made by the same applicant. Interpreting *Lively* and *Albright*, AR 00-1(4) states, in pertinent part:

> [W]hen adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.
>
> Where the prior finding was about a fact which is subject to change with the passage of time, such as a claimant's residual functional capacity, or that a claimant does or does not have an impairment(s) which is severe, the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and the period being adjudicated increases. An adjudicator should give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim, e.g., a few weeks as in Lively. An adjudicator generally should give less weight to such a prior finding as the proximity of the period previously adjudicated to the period being adjudicated in the subsequent claim becomes more remote, e.g., where the relevant time period exceeds three years as in Albright. In determining the weight to be given such a prior finding, an adjudicator must consider all relevant facts and circumstances on a case-by-case basis.

---

[4] Acquiescence Rulings explain how the SSA will apply a holding by a United States Court of Appeals that is at variance with the SSA's national policies for adjudicating claims. The SSA applies the holding to other cases in the same circuit when the issues involved are the same. https://www.ssa.gov/regulations/def-ar.htm.

65 Fed. Reg. 1936-01, 2000 WL 17162 (Jan. 12, 2000).

Courts within the Fourth Circuit have generally found remand appropriate under AR 00-1(4) where an ALJ neglects to discuss a prior decision at the administrative hearing level, and the prior decision contains findings more favorable to the claimant than the ALJ's subsequent decision. *See Barbee v. Colvin*, No. 5:14-CV-424, 2015 WL 5039124, at *8-*9 (E.D.N.C. Aug. 7, 2015) (recommending remand where ALJ's RFC finding did not include sit/stand option that was contained in past decision and ALJ failed to discuss past decision), *report and recommendation adopted by* 2015 WL 5054402 (E.D.N.C. Aug. 26, 2015); *Bennett v. Comm'r of Soc. Sec. Admin.*, No. 5:14CV100, 2015 WL 1280959, at *3, *13-*15 (N.D.W. Va. Mar. 20, 2015) (remanding where ALJ failed to discuss step two findings in prior decision and ALJ found fewer severe impairments at step two in later decision); *Manuel v. Colvin*, No. 1:11CV8, 2015 WL 519481, at *5-*6 (M.D.N.C. Feb. 9, 2015) (recommending remand where ALJ neglected to consider favorable step four finding in past decision and stating that court could not meaningfully review ALJ's decision because ALJ failed to discuss past decision); *Neal v. Astrue*, No. 5:08-cv-1296, 2010 WL 1404096, at *7 (S.D.W. Va. Mar. 31, 2010) (remanding where ALJ's recent decision limited claimant to light work, but prior decision limited claimant to sedentary work, and ALJ failed to conduct analysis required by AR 00-1(4)); *Dozier v. Astrue*, No. 5:08CV174, 2009 WL 3063020, at *2, *45 (N.D.W. Va. Sept. 22, 2009) (remanding where ALJ cursorily mentioned previous finding of disability and failed to indicate weight assigned to that decision); *Eatmon v. Colvin*, No. 5:13-CV-554, 2014 WL 4285140, at *2 (E.D.N.C. Aug. 29, 2014) (remanding where ALJ failed to discuss court's prior decision finding claimant disabled).

36

Similarly, in applying AR 00-1(4), this Court has recognized that an ALJ "must provide some semblance of an explanation to enable judicial review of his decision" where the ALJ's findings conflict with conclusions in a prior decision. *Bailey (Christopher) v. Colvin*, No. 6:13-cv-29150, 2015 WL 769843, at *11 (S.D.W. Va. Feb. 23, 2015). A step-by-step discussion is not required for an ALJ to comply with AR 00-1(4), but an ALJ's written decision must provide an explanation for discrediting or failing to adopt past administrative findings favorable to the claimant. *Grant v. Colvin*, No. 4:12cv191, 2014 WL 852080, at *7 (E.D. Va. Mar. 4, 2014) (recognizing that ALJ need not "walk through each factor in order to comply with AR 00-1(4)" and finding that ALJ complied with AR 00-1(4) where he discussed the Ruling, the prior decision, and medical evidence that warranted changes in the RFC finding).

In this case, the ALJ explicitly noted the ALJ's prior decision and the *Albright* ruling, but he explained that new and material evidence supported a departure from the prior ALJ's findings as evidenced by imaging, physical examination findings, and very high functioning activities of daily living. (Tr. at 15). The ALJ agreed that Claimant was limited to a reduced range of medium work, but the ALJ did not find evidence to support the prior ALJ's assessment that Claimant required a sit-stand option every 15 to 30 minutes, could not perform detailed and complex tasks and instructions, must avoid any interaction with supervisors and the public, and should only be exposed to mild to moderate workplace stress. (Tr. at 23-24). The ALJ cited Claimant's physical examination findings that showed only some discomfort standing, knee crepitus, thickened toenails, and foot calluses. (Tr. at 24). Moreover, the ALJ cited that Claimant had normal sensation in his feet and no need for an assistive device. (*Id.*). Regarding the mental limitations, the ALJ noted that despite Claimant's complaints of

37

depression, the majority of his mental status examinations were entirely normal with good hygiene and eye contact, relevant and goal directed speech, euthymic mood, appropriate affect, and cooperative participation. (*Id*.). As noted, the ALJ also discussed Claimant's numerous activities of daily living.

Claimant argues that "the ALJ did nothing more than determine his own RFC and [he] provided no comparative analysis to the prior RFC." (ECF No. 19 at 11). However, the ALJ very clearly cited and explained the plethora of evidence that supported his assessment of Claimant's functional abilities. Simply put, the ALJ found that the evidence of record created after the last ALJ's decision through Claimant's date last insured (the relevant period) did not substantiate that Claimant required a sit-stand option or mental RFC limitations. The ALJ found that new and material evidence in the form of imaging, physical examination findings, and very high functioning activities justified the deviation from the prior RFC. This reasoning is supported by substantial evidence. As the ALJ discussed, Claimant regularly bowled during the relevant period, as well as attended NASCAR events with his wife, went on a cruise to the Bahamas with his family, hunted with his father-in-law, cared for his stepson, built a pinewood derby car for his stepson to race, had his vintage car restored in preparation for car shows, joined a health club, planned to build a cabin on his father-in-law's property, and stayed busy around his house. (Tr. at 976, 990, 997, 1000, 1011, 1016, 1111). He complained of depression, knee pain, and ankle swelling if he was on his feet for hours, but his mental status examinations were primarily normal, as were his posture, gait, muscle strength, coordination, and sensation even years after his date last insured. (Tr. at 969, 976, 987, 991, 994, 998, 1000, 1005, 1012, 1281-82, 1312).

Therefore, the undersigned **FINDS** that the ALJ complied with AR 00-1(4) in considering the prior ALJ's RFC assessment, and the ALJ's analysis is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 18); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 20); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v.*

*Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** January 15, 2020

Cheryl A. Eifert
United States Magistrate Judge